**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MARK KOMADINA,

      Plaintiff,

    v.                                      Civ. No. 21-1143 MIS/SCY

USAA CASUALTY INSURANCE
COMPANY,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Plaintiff was working as a security guard when an unknown assailant shot him in the hip inside a shopping mall. The assailant arrived at the mall in a car and stayed in the car for about twelve minutes while the woman he came to the mall with shoplifted inside. Moments before the assailant went into the mall and shot Plaintiff, the assailant parked his car near the exit doors. When Plaintiff tackled the shoplifter before she made it out the exit doors, the assailant entered the store and shot Plaintiff. Immediately after the shooting, the assailant ran outside and drove away in the car. Plaintiff made a claim for uninsured motorist ("UM") benefits under his automobile insurance policy, under the theory that the assailant's uninsured motor vehicle was used in the shooting. Defendant, the insurer who issued Plaintiff the UM policy, disagreed and denied the claim.

Because the motor vehicle played no role in the shooting other than transportation to and from the scene of the crime, and because the shooting interrupted the causal link between the use of the vehicle for shoplifting and Plaintiff's injury, I agree with Defendant that the policy does not cover Plaintiff's claim. I therefore recommend the Court grant Defendant's Motion For Summary Judgment (Doc. 23).

**FACTS**

The parties do not dispute the following facts.[1] Plaintiff was working as a security guard at Dillard's in Cottonwood Mall on November 9, 2020 when a gold sedan pulled up outside of the Dillard's south lower-level doors. An unknown female exited the gold sedan and entered the store at about 4:14 p.m. At approximately 4:18 p.m., Dillard's employees became suspicious of the unknown woman's behavior and notified security. From 4:16 p.m. to 4:25 p.m., the woman can be seen roaming the lower-level floor of Dillard's while examining various clothing items and talking on her cell phone. At roughly 4:25 p.m., the woman got on an escalator and moved to the upper-level Dillard's area. Plaintiff followed her to the upper level. The woman spent the next two minutes examining clothing and talking on a cell phone.

At the 4:26:50 timestamp on the surveillance video (Exhibit 6) the woman grabbed several pairs of sweatpants off of a table and began heading towards the exterior upper-level doors. Seconds after the woman grabbed the sweatpants, Plaintiff started chasing the woman. While still well inside the store, Plaintiff tackled the woman and attempted to detain her. Meanwhile—just before Plaintiff grabbed the sweatpants, at the 4:26:30 timestamp on the surveillance video (Exhibit 7)—the gold sedan pulled up outside of the upper-level doors. While Plaintiff and the woman were wrestling on the ground, at approximately 4:27 p.m., an unknown male entered the store and shot Plaintiff in the hip. The male assailant and the female shoplifter then exited Dillard's and entered the gold sedan that the assailant had just parked outside the exterior upper-level doors. They drove northbound through the parking lot in the gold sedan.

---

[1] These facts are taken from Defendant's statement of Undisputed Material Facts, Doc. 23 at 2-4, all of which Plaintiff admits. Doc. 29 at 2. In addition, the facts are based on copies of surveillance video provided to the Court as Exhibits 1, 2, 4, 5, 6, and 7, the authenticity of which Plaintiff does not dispute.

Over twelve minutes passed between the female shoplifter entering the store and the shooting, and all of these events were captured by surveillance video.

At the time of the incident, Defendant provided a policy of automobile insurance to Plaintiff which included uninsured motorist ("UM") coverage. On August 25, 2021, Plaintiff made a claim for UM benefits to compensate him for damages related to the shooting. Under the terms of the policy, Defendant agreed to pay damages which a "covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle . . . ." Doc. 23-2 at 25. "The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured motor vehicle." *Id.* On September 9, 2021, Defendant denied the claim after determining the incident did not arise out of the use of a motor vehicle.

Plaintiff filed suit in state court on November 1, 2021. Doc. 1-1 at 2. Plaintiff brings claims for bad faith, breach of the covenant of good faith and fair dealing, breach of contract, unfair claims practices, and unfair trade practices. *Id.* Defendant removed the case to federal court on December 1, citing diversity jurisdiction. Doc. 1 at 3. Defendant filed the instant motion for summary judgment, arguing that under New Mexico law and the language of the policy, UM coverage does not apply to a shooting inside of a department store, and so Plaintiff cannot sustain any of his claims for breach of the insurance contract or bad faith. Doc. 23. The Honorable Margaret I. Strickland referred this matter to me pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a). Doc. 33.

## **STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

In this diversity jurisdiction case, the court applies New Mexico substantive law to the questions raised in the motion for summary judgment. *State Farm Mut. Auto. Ins. Co. v. Blystra*, 86 F.3d 1007, 1010 (10th Cir. 1996).

## **DISCUSSION**

A.   New Mexico uses a three-factor test to determine whether uninsured motorist coverage is available in assault cases such as this.

The parties, and every court applying New Mexico law since 1995, agree that the starting point for analysis in cases such as this is *Britt v. Phoenix Indemnity Ins. Co*., 1995-NMSC-075, 907 P.2d 994. There, the New Mexico Supreme Court concluded, "an intentional act may be an 'accident' for uninsured motorist coverage purposes," but "there must be some connection, other than proximity in time and place, between the [intentional] act and that of the uninsured motorist." *Britt*, 1995-NMSC-075, ¶ 1. Having so concluded, *Britt* adopted a three-part "analysis

for determining whether intentional conduct and its resulting harm arises out of the use of an uninsured vehicle": (1) "whether there is a sufficient causal nexus between the use of the uninsured vehicle and the resulting harm"; (2) "whether an act of independent significance broke the causal link between the use of the vehicle and the harm suffered"; and (3) "whether the 'use' to which the vehicle was put was a normal use of that vehicle." *Id.* ¶ 15. For uninsured motorist coverage to exist, each of these three factors must favor the claimant. Defendant argues none do. Plaintiff disagrees and argues all do. I conclude that neither factor one nor factor two weighs in favor of Plaintiff and, therefore, recommend that the Court grant Defendant's motion for summary judgment.

        B.    <u>Because the uninsured vehicle was not used as an active accessory, an insufficient nexus exists between the use of the uninsured vehicle and the harm.</u>

A causal nexus between the uninsured vehicle and resulting harm cannot exist unless the vehicle is used as an "active accessory." *Britt*, 1995-NMSC-075, ¶ 15 ("a causal nexus requires that the vehicle be an 'active accessory' in causing the injury."). For instance, when a vehicle is used for the purposes of a "drive-by" shooting, the vehicle serves as an active accessory to the assault. *State Farm Mutual Automobile Insurance Co. v. Blystra*, 86 F.3d 1007, 1009 (10th Cir. 1996). In *Blystra*, while Kevin Blystra was walking home from school, an occupant of a white pickup truck shot him in the leg with a pellet gun as the truck drove by. The Tenth Circuit held that "[w]hen an automobile is used by an assailant to undertake a drive-by shooting, the automobile is almost by definition an 'active accessory' to the assault." *Id.* at 1012. The court elaborated:

> Through the use of an automobile, a drive-by shooter achieves several advantages in the commission of his crime that would otherwise be unavailable to him. First, the assailant can use the vehicle to unsuspiciously and quickly approach his victim, all the while hiding from public observation that he is armed with a gun. Second, during the commission of the assault, the assailant can use the vehicle to

help hide his identity. Third, the assailant can use the vehicle to leave the scene quickly and avoid apprehension.

*Id.*

On the other end of the scale, the New Mexico Court of Appeals has explained that "the mere fact that the vehicle is used to transport the assailant and/or the victim to or from the scene of the intentional tort is not a sufficient connection." *Crespin v. Safeco Ins. Co. of Am.*, 2018-NMCA-068, ¶ 30, 429 P.3d 968, 975. In *Crespin*, Defendants Fabian Fierro, age 18, and Travis Bainbridge, age 19, picked up Plaintiff Jessica Crespin, age 14, from her school in an uninsured vehicle. *Id.* ¶ 1. They drove to Fierro's mother's house where they listened to music for about twenty minutes, and then Fierro had sexual relations with Crespin and Bainbridge sexually assaulted her. *Id.* ¶¶ 1, 6. Fierro would not have picked Crespin up from school if he did not have use of the car. *Id.* ¶ 4. Crespin entered and exited the car willingly, although she was unaware that the men intended to sexually assault her, and she was not sexually assaulted or harmed while she was in the car. *Id.* The court of appeals held:

> [The uninsured] car was not an integral element of the sexual assault. The sexual assault did not occur in the car. On the contrary, Fierro, Bainbridge, and Crespin each had voluntarily exited the car and gone into the house for a considerable amount of time—more than twenty minutes—before the sexual assault had occurred. . . . [T]he vehicle did not provide Bainbridge with any physical or proximal advantage in committing the sexual assault.

*Id.* ¶ 29. That is, "Crespin left the vehicle a considerable amount of time prior to the assault by Bainbridge; the vehicle did not play a part in the assault, and instead the vehicle was used only to transport Fierro, Bainbridge, and Crespin to the site of the sexual assault." *Id.* ¶ 32. The court contrasted this situation with drive-by shooting cases, in which "the assailants' vehicles were used to approach the victims without being noticed, get into a position where the assailants could shoot the victims, and then escape without being identified or apprehended." *Id.* ¶ 30.

Also distinguishable from a drive-by shooting is the shooting that occurred in *Hartford Insurance Co. of the Midwest v. Estate of Tollardo*. There, Jason Perea shot and killed Nathaniel Maestas, Alfredo Rael, and Eric Tollardo while they were sitting in a car. 409 F. Supp. 2d 1301, 1302 (D.N.M. 2005). Perea had been looking for Tollardo after a drug-related dispute. *Id.* at 1302-03. Perea was driving around Taos in his truck for two or three hours when he decided to give up and go home. *Id.* By chance, on his way home, he spotted a blue car he recognized, parked at a gas station. *Id.* at 1303. He drove his truck into a pole, exited the truck, crossed the parking lot of the gas station on foot carrying two guns, and started firing at the blue car when he was two-and-a-half car lengths away. *Id.* at 1304. Perea ran up to the car and fired into the driver's side window because Tollardo was sitting in the driver's side seat. *Id.* After he ran out of ammunition, Perea ran back to his truck and left the scene. *Id.* The car in which the three victims died was owned by Rael's mother. *Id.* The victims made an uninsured motorist claim under the mother's policy, arguing that Perea was an uninsured motorist and his truck was an "active accessory" to the crime. *Id.* at 1304-05.

The district court determined that the truck was not an active accessory. First, the court held that Perea was using his truck for the sole purpose of going home, not in order to murder Tollardo because Perea had given up his hunt before he spotted the blue car at the gas station. *Id.* at 1309. Second, the court found that "the truck, far from aiding Perea [to] launch his attack, actually hindered his efforts" because he crashed it into a pole and had to cross the parking lot on foot. *Id.* at 1309-10. Finally, the court found that "using a vehicle merely to escape" the scene of a crime does not satisfy the active-accessory test. *Id.* at 1310. The court explained:

> The Court sees no reason why transportation away from, but not to, the scene of a crime should render the vehicle an active accessory. There is even less of a causal connection between the former use of an automobile and an injury for the simple reason that the injury would occur before the use of the vehicle to escape.

>       Furthermore, two of the advantages identified by the Tenth Circuit that make use
>       of an automobile as an active accessory attractive to assailants—stealth pursuit of
>       the victim and concealment of one's identity—do not come into play when a
>       vehicle is only used to escape.

*Id.*

Somewhere in the middle of the scale, a handful of cases pertain to shootings *near* an

automobile that are nonetheless not drive-by shootings. In *Barncastle v. American National*

*Property & Casualty Companies*, the insured was in his vehicle stopped at a traffic light. 2000-

NMCA-095, ¶ 2, 11 P.3d 1234, 1235. An unidentified vehicle pulled up next to the insured's car

and an unidentified passenger got out, walked to the window, and shot the insured with a

handgun. The assailant immediately returned to the unidentified vehicle, which left the scene at a

high rate of speed with its headlights off. *Id.* The court of appeals held the vehicle was an active

accessory because the driver of that vehicle used it to get into a position where the assailant

could get out and shoot, and the vehicle was used to escape the scene at a high rate of speed. *Id.* ¶

9.

In contrast, a district court in *Mendoza v. Dairyland Insurance Co*. found that a passenger

who shot a victim shortly after getting out of an uninsured vehicle did not use the vehicle as an

active accessory to the assault. No. 18cv362-SWS-MLC, 2018 WL 7354717 (D.N.M. Dec. 13,

2018). The victim was standing outside his car in the parking lot of a casino. *Id.* at *1. A dark-

colored vehicle stopped behind him, the front seat passenger got out of the vehicle, and the

vehicle drove away. *Id.* The front-seat passenger approached the victim and attempted to mug

him, shooting the victim in the face with a BB gun. *Id.* The assailant then ran through the parking

lot, got back in the dark-colored vehicle, and fled the scene in the vehicle. *Id.* The court held

there was no causal connection. The driver did not use the vehicle to quickly appear alongside

the victim without warning and accomplished his assault "without using the vehicle in any way

to conceal his identity or the presence of a weapon." *Id.* at *4. The assailant could have left the scene more inconspicuously on foot than he did by using the vehicle, which was ultimately responsible for identifying the assailant, so the vehicle facilitated neither the assault nor the escape. *Id.*

A common thread in each of these cases is that the location of the crime matters. The closer to the vicinity of the vehicle the crime occurs, the more likely it is that the vehicle played a role in the crime outside mere transportation. In the present case, the assault did not occur in a place where cars travel, such as an intersection, the exposed side of a roadway, or a parking lot. The vehicle was outside the store for twelve minutes while the shoplifter shoplifted. And, the assailant left his car and went inside the store to shoot Plaintiff.

Nonetheless, Plaintiff argues, the assailant used "the vehicle to position himself near the door to facilitate the commission of their crimes." Doc. 29 at 5. This argument is unconvincing. That a person who assaults someone in a mall happened to arrive at the mall in a car parked just outside the mall is unremarkable. Most people in a mall at any given time likely arrived there in a car parked just outside the mall. This, however, does not make the vehicle an active accessory to any crime that is then committed within the mall.

Granted, the assailant did not park in a designated parking space. He parked next to the curb just outside the exterior doors which, undoubtedly, made for a quicker getaway. As noted above, the proximity between the car and the assault is a relevant factor. Indeed, the Tenth Circuit in *Blystra* noted that "us[ing] the vehicle to leave the scene quickly and avoid apprehension" is a factor courts should consider. 86 F.3d at 1012.  But this factor alone is not enough to make the car an active accessory to the crime. Any criminal who plans to use a car to get away from a crime has an incentive to keep the car as inconspicuously close to the scene of

the crime as possible. And the use of a car to get away will almost always allow the criminal to get away more quickly than he or she could on foot. This would be true even of a criminal who spent hours in the mall before committing a crime and then using a car to make a quick getaway. As the court in *Tollardo* noted, however, "using a vehicle merely to escape" the scene of a crime does not make the vehicle an active accessory. 409 F. Supp. 2d at 1310.

Plaintiff relies on *Almager v. Doe* to argue otherwise. Doc. 29 at 7-8. In *Almager*, the assailant was attempting to steal the insured's vehicle from a parking lot. 549 F. Supp. 3d 1276, 1277 (D.N.M. 2021). The insured ran to the vehicle and tackled the assailant. *Id.* Another vehicle was parked nearby as a getaway car. *Id.* The assailant shot the insured, returned to the getaway car, and drove off. *Id.* Plaintiff argues, "As in *Almager*, the vehicle used by the assailant in this case was an active accessory which allowed the crime to take place. It afforded the assailant proximity to the area in which the passenger was planning to shoplift from, and a quick get-away from the scene of the originally planned crime—shoplifting." Doc. 29 at 8. But *Almager* is distinguishable. To begin with, although the court held that the *Britt* test was satisfied, *id.* at 1285-88, it did not explicitly discuss the "active accessory" factor, and so is less persuasive with respect to the analysis of this factor. Moreover, *Almager* is distinguishable on its facts. The assault there occurred *outside and next to* the getaway car and insured vehicle, in a parking lot. *Id.* at 1277. In contrast, the assault in the present case occurred inside a store where cars could not go.

Finally, *Almager* never says that using a vehicle merely to escape necessarily makes the vehicle an active accessory to the crime. And, even if *Almager* could be read so broadly, it is non-binding, would create a split in the District of New Mexico (as *Tollardo* concluded otherwise), and would conflict with binding precedent from *Blystra* that indicates "us[ing] the

vehicle to leave the scene quickly and avoid apprehension" is only one factor district courts should consider. *See Blystra*, 86 F.3d at 1012.

And the other two factors the Tenth Circuit identified in *Blystra* weigh against coverage in this case. First, the assailant did not use the vehicle to "unsuspiciously and quickly approach his victim." *Cf. Blystra*, 86 F.3d at 1009. The vehicle was outside; the assailant exited it and entered the store; the assailant shot Plaintiff while Plaintiff was grappling with someone else; and then the assailant ran out the store. The presence of the vehicle outside the store was not relevant to this sequence of events inside the store.

Second, during the commission of the assault, the assailant did nothing to "use the vehicle to help hide his identity." *Cf. Blystra*, 86 F.3d at 1009. Plaintiff argues the vehicle "served as a means by which to conceal his identity and the weapon," Doc. 29 at 8, but does not explain this contention. There is no immediately obvious use of the vehicle as concealment for a person who parks outside a store, exits the car in broad daylight, in front of witnesses, and under a surveillance camera; enters the store subject to surveillance cameras and witness observation; and then runs back outside to the vehicle—again subject to surveillance cameras and witness observation the entire time. To the contrary, the assailant's decision to park next to the exterior doors made it easier to identify his getaway car and did little to nothing to help hide his identity.

In summary, the vehicle played no role in the assault—it was used merely as transportation to and from the scene of a crime. This does not satisfy the "active accessory" test under New Mexico case law.

Further, as noted below in my analysis of the second *Britt* factor, to the extent Plaintiff has a colorable argument that the driver used the vehicle as an active accessory to a crime, the crime the vehicle was used to commit was shoplifting, not assault with a deadly weapon.

Case 1:21-cv-01143-MIS-SCY   Document 35   Filed 01/24/23   Page 12 of 19


C.      An act of independent significance broke any causal link between the use of the
        uninsured vehicle and the harm suffered.

Even though all New Mexico case law analyzing whether UM coverage is available for

an intentional tort flows from *Britt*, analysis of *Britt* is conspicuously absent in the above section.

That is because once *Britt* established the three-factor test to be used in subsequent cases, it

focused its analysis on the second factor (whether an act of independent significance broke any

causal link between the use of the uninsured vehicle and the harm suffered).[2]

In so doing, *Britt* considered the following facts. The plaintiff, Daniel Britt, was a

passenger in a vehicle that was struck from behind by another vehicle. *Britt*, 1995-NMSC-075, ¶

2. Britt exited the vehicle in order to assess the damage and to obtain information from the driver

of the other vehicle. *Id.* Two male passengers exited the other vehicle, and a physical altercation

ensued. *Id.* As Britt retreated back to his vehicle, one of the other men pursued him and stabbed

him through the open passenger-door window. *Id.* The identities of the assailants and the other

vehicle were never established. *Id.*

These facts, however, failed to answer the question *Britt* considered relevant to resolution

of the second factor: whether the assailant developed his intent to commit an assault before, or

after, the collision. The court reasoned:

> If, as Britt asserted, the unidentified driver intentionally rammed Glass's vehicle
> in complicity with the assailants or in order to facilitate the attack, then the
> assailants' actions probably did not constitute an "independent intervening cause"
> sufficient to cut off the nexus between the driver's actions and Britt's injuries. If,
> on the other hand, the collision was accidental and the assailants developed the
> intent to attack Britt after the collision, perhaps due to hot tempers resulting from

---

[2] Regarding the first factor, *Britt* simply stated, "we conclude that there well may have been a
sufficient causal link between the use of the uninsured vehicle for transportation and Britt's
injuries." *Britt*, 1995-NMSC-075, ¶ 16.

the collision, then their actions broke the causal link between the use of the
vehicle and Britt's injury.

*Id*. ¶ 16. Similar to *Britt*, if the assailant in this case developed the intent to shoot Plaintiff after
using the vehicle to arrive at the mall, the assault broke any causal link between the use of the
uninsured vehicle in this case and Plaintiff's injuries.

The undisputed facts in the present case demonstrate that the driver (later assailant) and
shoplifter did not come to the mall to commit an assault. As Plaintiff rightfully points out,
evidence does exist that the driver and shoplifter intended to use the uninsured vehicle as a
getaway car.[3] After all, the driver dropped the shoplifter off at a set of lower-level doors. The
shoplifter went upstairs, stole some merchandise, and attempted to make her escape through a set
of upper-level doors. While the shoplifter was in the store, the driver, who we know later entered
the store through the upper-level doors, knew to drive the car to the upper-level doors to meet
Plaintiff for their escape.[4] As Plaintiff argues, a reasonable jury could conclude from these facts
that, before the assault, the pair had planned to use the uninsured vehicle as a getaway car.

But these facts also demonstrate that, to the extent the pair planned to use the car to get
away from a crime, the crime they intended to get away from was shoplifting, not assault with a
deadly weapon. The driver (and later assailant) moved the gold sedan from the lower-level doors
to the upper-level doors a few seconds before the shoplifter took the sweatpants and Plaintiff
began running after the shoplifter. Indeed, Plaintiff notes in his brief that the car "afforded the

---

[3] As noted above, using a vehicle to flee the scene of a crime does not, in itself, make the car an
active accessory for purpose of the first *Britt* factor. *Tollardo*, 409 F. Supp. 2d at 1310; *Crespin*,
2018-NMCA-068, ¶ 30 ("the mere fact that the vehicle is used to transport the assailant and/or
the victim to or from the scene of the intentional tort is not a sufficient connection").

[4] Plaintiff asserts, "The video suggests the passenger who attempted the theft called the
assailant and arranged for the get-away vehicle to be positioned just outside the doors from the
display area where the theft was attempted." Doc. 29 at 5.

assailant proximity to the area in which the passenger was planning to shoplift from, and a quick get-away from the scene of the originally planned crime—shoplifting." Doc. 29 at 8. And, had Plaintiff not tackled the shoplifter, this plan might have worked. The shoplifter would have run out of the upper-level doors, jumped into the waiting car, and sped away with her getaway driver. Plaintiff's act of tackling the shoplifter, however, served as an intervening event that prevented this planned use of the car. Because Plaintiff was preventing the shoplifter from exiting through the upper doors, the shoplifter could not get to the car where she and her getaway driver could speed away together. In other words, Plaintiff's actions prevented the getaway driver from performing the role originally assigned to him and caused him to take on a new role in a different, unplanned, crime.[5]

The intervening actions of Plaintiff caused the getaway driver to change roles from getaway driver to assailant. Rather than waiting in the car and using it to get away from the crime of shoplifting, the driver got out of the car, went into the store, and shot Plaintiff. No indication exists, and it would be unreasonable to conclude, that the getaway driver formed the intent to shoot Plaintiff *before* Plaintiff attempted to stop the shoplifter from escaping.

Compare this situation to that in *Britt*. As *Britt* noted, a central question is "whether Britt's injury arose out of the use of the uninsured vehicle . . . ." *Britt*, 1995-NMSC-075, ¶ 16.

---

[5] No evidence exists to infer that shooting a security guard was part of the original crime. *See McKinley v. Interinsurance Exch. of the Auto. Club*, 2022-NMCA-055, ¶ 13, 517 P.3d 937, 941, *cert. granted* (July 11, 2022) ("Although the evidentiary burden is not high, *see Britt*, 1995-NMSC-075, ¶ 12, and circumstantial evidence may suffice to overcome summary judgment, *see Schneider Nat'l, Inc. v. N.M. Tax'n & Revenue Dep't*, 2006-NMCA-128, ¶ 18, some evidence is required to permit an inference that the Hernandez Defendants used the vehicle's inherent characteristics to facilitate the attack on Mr. McKinley.").

Thus, if the driver and soon-to-be assailant passenger had agreed to use their vehicle to ram Britt's vehicle, the subsequent stabbing would "probably" be a continuation of the same assault. *See id*. If the collision was just an accident, however, and the assailant formed the assaultive intent after the collision, even if as a result of the collision, the formation of the intent to assault and assault would constitute an independent intervening cause of the injury. *See id*. (the answer to the question of "whether Britt's injury arose out of the use of the uninsured vehicle . . . depends on the state of mind of the uninsured vehicle's operator at the time of the collision"). This is because, in this latter situation, the vehicle was never intended to be used in an assault.

In the present case, even assuming the uninsured vehicle was being used as a getaway car in connection with a shoplifting conspiracy, that use ended when the getaway driver left his post behind the steering wheel of the car so he could enter the store and shoot Plaintiff. No evidence exists, and no reasonable juror could conclude, that it was ever the driver's intent to use the uninsured vehicle to assault Plaintiff. Plaintiff's act of tackling the shoplifter, and the driver's decision to then leave the car, enter the store, and shoot Plaintiff, would constitute independent intervening events that would foreclose Plaintiff's claim even if the first factor (a causal nexus existed between the use of the uninsured vehicle and the resulting harm) could be resolved in Plaintiff's favor.[6]

The cases Plaintiff cites do not indicate otherwise. In support of his argument that there was no independent intervening event, Plaintiff primarily relies on *Almager.* Doc. 29 at 8-9. As

---

[6] Unlike the New Mexico Supreme Court in *Britt*, which was not charged with determining in the first instance whether a reasonable and material dispute of fact existed as to a central question (and so remanded to the district court to send that determination to arbitration, as specified in the insurance policy), this Court is charged with making such determinations. Unlike the *Britt* court, this Court can, and should, decide whether evidence exists to support an inference that, even assuming the driver intended to use the car as an active accessory to shoplifting, the driver also intended to use the car to assault Plaintiff.

noted above, *Almager*, like the present set of facts, involved a theft gone bad. As in the present case, in an attempt to stop a theft, the plaintiff tackled the thief to the ground, which caused the driver of the uninsured vehicle to get out of the vehicle and intervene. 549 F. Supp. 3d at 1277.[7] As Plaintiff correctly points out, the *Almager* court rejected the defendant's argument that an independent intervening event necessarily occurs when the driver of the uninsured vehicle exits the vehicle to take part in a crime. Doc. 29 at 9-10 (quoting *Almager*, 549 F. Supp. 3d at 1286-87).

I agree that it is not necessarily an independent intervening event whenever a driver, or an accomplice passenger, exits the uninsured vehicle to commit an assault. *See Barncastle*, 2000-NMCA-095, ¶ 2 (where the assailant jumped out of the car at a traffic light, shot the plaintiff, jumped back in the car, and fled the scene, the assault did not constitute an independent intervening event). Thus, I do not recommend that the Court find an independent intervening event solely on the basis that the driver in the present case got out of the car to commit an assault. Instead, I recommend finding an independent intervening event based on my analysis of *Britt*, above. The *Almager* court did not engage in a similar analysis.

Further support for my conclusion comes from a New Mexico Court of Appeals opinion, published after *Almager*, that also involved a tragic theft-gone-bad scenario. Unlike *Almager*, however, in *McKinley v. Interinsurance Exchange of the Automobile Club* the court did analyze *Britt*'s directive to consider whether the formation of an assailant's assaultive intent broke the causal link between the use of the vehicle and the harm suffered. 2022-NMCA-055, ¶ 3, 517

---

[7] Rather than assaulting the plaintiff herself, however, the driver told her accomplice to "take care of him." 549 F. Supp. 3d at 1277. As a result, her accomplice shot the plaintiff. *Id*.

P.3d 937, 938, *cert. granted* (N.M. July 11, 2022).[8] The plaintiff in *McKinley* was the personal representative of a homeowner who caught some thieves breaking into his truck. *Id*. The homeowner chased the thieves down his driveway and into an uninsured car the thieves had parked at the bottom of the driveway. *Id*. During an ensuing struggle, one of the thieves stabbed, and killed, the homeowner. *Id*.

The New Mexico Court of Appeals agreed with the district court that "independent acts of significance broke any causal link between use of the uninsured vehicle and the intentional stabbing." *Id*. ¶ 9. The court concluded that these facts did not support an inference that the thieves "used the vehicle's inherent characteristics to facilitate that attack on [the homeowner]." *Id*. ¶ 13. Even assuming the vehicle was used to commit a theft, that use of the vehicle "would be interrupted by the attack itself." *See id*. ¶ 14. Thus, the court concluded:

> Neither the stipulated facts, however, nor any reasonable inference, indicates that the Hernandez Defendants anticipated any attack as they used the uninsured vehicle to rob other vehicles, park in Mr. McKinley's driveway, or when they ran toward the vehicle and got inside. Nor does any intended use of the vehicle to flee or protect property, under these circumstances, demonstrate use of the vehicle to facilitate an attack against Mr. McKinley. Without evidence to connect flight or protection of the stolen property to the attack, the reasonable inference is that the Hernandez Defendants' attempt at flight was interrupted by the attack on Mr. McKinley.

*Id*. ¶ 15 (citation omitted). Similarly in the instant case, neither the stipulated facts, nor any reasonable inference, indicates that the driver and shoplifter anticipated any attack as they used the uninured vehicle to shoplift items from the store, parked the car near the upper-level doors, or when the shoplifter attempted to flee from Plaintiff. Nor does any intended use of the vehicle to

---

[8] The New Mexico Court of Appeals decided *McKinley* after Defendant filed its opening brief, but before Response and Reply briefs were filed.

flee demonstrate use of the vehicle to facilitate an attack on Plaintiff. To the extent the driver and shoplifter used the vehicle to shoplift, that use was interrupted by the attack on Plaintiff.

This conclusion is consistent with other cases that have considered whether an assault constituted an independent intervening event that broke the causal connection between the use of an uninsured vehicle and the harm suffered. In *Barncastle*, it was reasonable to infer that the uninsured vehicle was being used for the assault. Its use was analogous to using the uninsured vehicle in *Britt* to ram Britt's car. Because the car was being used to commit the crime of assault, the assault that led to the harm did not constitute an independent intervening event.

In contrast, the assault in *Tollardo* did not constitute an independent intervening event, in part, because the *Tollardo* court concluded that the assailant was not using his truck to commit an assault. 409 F. Supp. 2d at 1309. The court wrote, "As [the assailant] approached the gas station, he was using his truck for the sole purpose of going home, and not to look for [the victim] and his associates, because he had given up his quest for revenge. [The assailant] was not employing his truck for anything as dramatic as murder, but for something much more prosaic: returning to his apartment. As a result, when Perea initiated his assault on the blue car, he was not using his car to assist any plot against the occupants of the blue car." *Id.* Thus, based on *Britt* and its progeny,[9] I conclude under the second factor of the *Britt* test that the driver's assault of

---

[9] In addressing the first *Britt* factor, Plaintiff cites to *Mendoza*. Doc. 29 at 5-6. The Court agrees that *Mendoza*, which only addressed the first *Britt* factor, provides no guidance regarding resolution of the second *Britt* factor. *See Mendoza*, 2018 WL 7354717, at *4 ("Because Plaintiffs cannot show a causal nexus between use of the uninsured vehicle and the resulting harm, the Court need not address the other two parts of the *Britt* test."). Nonetheless, I will briefly address Plaintiff's assertion related to an intervening act in *Mendoza*. Plaintiff asserts, "[T]he intent to commit the assault was spur-of-the-moment and a crime of opportunity. There was no evidence in *Mendoza* that the assailant formed a plan to commit an assault when he entered the car or exited the car. . . . Mendoza's assailant did not intend to shoot Mendoza when he entered the vehicle, nor when he left the vehicle. It was Mendoza's intervening act of refusing to give the assailant money that prompted the attack." Doc. 29 at 6. First, as noted, the *Mendoza* court did

Plaintiff constituted an independent intervening event that, as a legal matter, precludes Plaintiff from recovering the uninsured motorist benefits he seeks.

> D. <u>The Court need not address whether the uninsured vehicle was put to its normal use.</u>

On the remaining factor, Defendant argues that because the assailant was not "using" the vehicle to commit the assault, Plaintiff's claim fails the "normal use" test. Doc. 23 at 12-16. It is not necessary to address this factor, because Plaintiff's claim for uninsured motorist benefits fails on the first and second prongs, and Plaintiff must prevail on all three prongs for his claim to succeed.

## **CONCLUSION**

I recommend that Defendant's Motion for Summary Judgment be GRANTED in full.


STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

not address whether there was an intervening act in Mendoza. Second, assuming for the sake of argument that the *Mendoza* victim's refusal to give the money prompted the attack and so constituted an intervening act, so too here: it would be the shoplifter's decision to struggle with Plaintiff that prompted the attack.